UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
••••••••••••••••••••••••••••••••••••••••••••••••••••••••

**PASS & SEYMOUR, INC.,**

                                        **Plaintiff,**

                 **-v-**                            **5:07-CV-945 (NAM/DEP)**

**HUBBELL INCORPORATED,**

                                        **Defendant.**

••••••••••••••••••••••••••••••••••••••••••••••••••••••••

APPEARANCES:

BOND, SCHOENECK & KING, PLLC
David L. Nocilly, Esq., of counsel
Edward R. Conan, Esq., of counsel
George R. McGuire, Esq., of counsel
Frederick J. M. Price, Esq., of counsel
One Lincoln Center
Syracuse, New York 13202
and
GOODWIN, PROCTER LLP
Andrew N. Stein, Esq., of counsel
Ankur P. Parekh, Esq., of counsel
Mark J. Abate, Esq., of counsel
620 Eighth Avenue
The New York Times Building
New York, New York 10018-1405
and
GOODWIN, PROCTER LLP
Charles H. Sanders, Esq., of counsel
Exchange Place, 53 State Street
Boston, Massachusetts 02109-2881
Attorneys for Plaintiff

ROYLANCE, ABRAMS, BERDO & GOODMAN, LLP
Alfred N. Goodman, Esq., of counsel
Kevin M. Barner, Esq., of counsel
Mark S. Bicks, Esq., of counsel
1300 19th Street NW, Suite 600
Washington, DC 2003
and
COSTELLO, COONEY & FEARON, PLLC
Edward G. Melvin, Esq., of counsel
Salina Place, 205 South Salina Street
Syracuse, New York 13202
Attorneys for Defendant

**Hon. Norman A. Mordue, Chief U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

### INTRODUCTION

This patent infringement action by Pass & Seymour, Inc. ("P&S") involves ten patents, all relating to "ground fault circuit interrupters" ("GFCIs"). Upon referral pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.3(c), United States Magistrate Judge David E. Peebles conducted claim construction proceedings, *see Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995), *aff'd* 517 U.S. 370 (1996), and issued an excellent Report and Recommendation (Dkt. No. 62) to this Court. Both parties object to certain aspects of the Report and Recommendation. Pursuant to 28 U.S.C. § 636(b)(1)(C), the Court reviews *de novo* those parts of the Report and Recommendation to which a party specifically objects.

The Court adopts and refers the reader to Magistrate Judge Peebles' summary of the case and the applicable law. The Court also adopts without further discussion those aspects of the Report and Recommendation to which neither party has objected. The Court grants the letter motion (Dkt. No. 68) by defendant Hubbell, Inc. ("Hubbell") requesting that the Court consider the Federal Circuit Court of Appeals' decisions in *Pass & Seymour, Inc. v. International Trade Comm'n*, 617 F.3d 1319 (Fed.Cir. 2010), and *General Protecht Group v. International Trade Comm'n*, 619 F.3d 1303 (Fed.Cir. 2010), decided after Magistrate Judge Peebles issued his Report and Recommendation. As set forth below, the Court adopts Magistrate Judge Peebles' learned Report and Recommendation except to the extent necessary to conform to the Federal Circuit's decisions.

### DISCUSSION

Of the ten patents, defendant Hubbell objects to certain recommended claim constructions in the following: U.S. Patent No. 5,594,398 ("'398 patent"); U.S. Patent No. 7,283,340 ("'340 patent"), and U.S. Patent No. 7,212,386 ("'386 patent"). Hubbell also objects to the

recommended construction of the term "detect" in the following: the '340 patent; the '386 patent; U.S. Patent No. 7,164,564 ("'564 patent"); U.S. Patent No. 7,256,793 ("'793 patent"); U.S. Patent No. 7,375,938 ("'938 patent"); U.S. Patent No. 6,873,158 ("'158 patent"); and U.S. Patent No. 6,980,005 ("'005 patent").  Plaintiff P&S objects to certain recommended claim constructions in the '938 patent, the '158 patent, and the '005 patent.  There is no objection regarding U.S. Patent No. 7,173,799.  The objections regarding U.S. Patent No. 7,154,718 have been withdrawn.

After Magistrate Judge Peebles issued his Report and Recommendation, the Federal Circuit Court of Appeals decided *Pass & Seymour, Inc. v. International Trade Comm'n* ("*P&S v. ITC*"), 617 F.3d 1319 (Fed.Cir. 2010), and *General Protecht Group v. International Trade Comm'n* ("*General Protecht v. ITC*"), 619 F.3d 1303 (Fed.Cir. 2010).  In these two cases, the Federal Circuit decided appeals from a Final Determination issued by the International Trade Commission ("ITC") upon its review of certain rulings by Administrative Law Judge Carl C. Charneski ("ALJ") in *In the Matter of Certain Ground Fault Circuit Interrupters and Products Containing Same*, Inv. No. 337-TA-615.  The proceedings stemmed from a complaint to the ITC by P&S alleging that respondents were importing and/or selling devices that infringed a number of P&S patents.  Hubbell was not a party to the proceedings.  Three of the patents in issue in the ITC proceedings, the '398, '340, and '386 patents, are also in issue in the instant action.  On the appeals, the Federal Circuit construed certain claim terms that are in dispute in the present case.  These are discussed below where relevant.

Because claim construction is a question of law, the Federal Circuit's claim constructions are accorded *stare decisis* effect.  *See Markman*, 517 U.S. at 391; *Key Pharm. v. Hercon Labs. Corp.*, 161 F.3d 709, 716 (Fed.Cir. 1998); *Cybor Corp. v. FAS Tech., Inc.*, 138 F.3d 1448, 1455 (Fed.Cir. 1998).  Thus, district courts are bound to apply the Federal Circuit's claim constructions, even as against non-parties to the initial litigation.  *See, e.g., Rambus, Inc. v. Hynix*

*Semiconductor Inc.*, 569 F.Supp.2d 946, 963-64 (N.D.Cal. 2008); *Wang Labs., Inc. v. Oki Elec. Indus. Co.*, 15 F.Supp.2d 166, 175-76 (D.Mass. 1998).  Here, as will be seen below, the Federal Circuit's claim constructions are consistent in all respects with those recommended by Magistrate Judge Peebles.

**HUBBELL'S OBJECTIONS TO THE REPORT AND RECOMMENDATION**

**<u>The '398 Patent</u>**

The disputed terms in U.S. Patent No. 5,594,398 ("'398 patent"), issued January 14, 1997, titled "Ground Fault Interrupter Wiring Device with Improved Moveable Contact System," are found in Claim 1, which reads:

> 1. A <u>ground fault interrupter (gfi) wiring device for connection in an electrical circuit</u>, said device comprising:
>
> a.   housing means defining an enclosed space;
>
> b.   at least one pair of electrical terminals fixedly supported in spaced relation within said enclosed space;
>
> c.   <u>a unitary, electrically conducting member carrying a pair of spaced electrical contacts;</u>
>
> d.   <u>mounting means for said conducting member to permit movement thereof between a first position, wherein said pair of contacts are in respective, circuit-making engagement with said pair of terminals, and a second position, wherein both of said pair of contacts are in spaced, circuit-breaking relation to said pair of terminals;</u>
>
> e.   biasing means urging said conducting member toward movement to said second position;
>
> f.   <u>latching means releasably retaining said conducting member in said first position;</u> and
>
> g.   actuating means for releasing said latching means to permit said biasing means to move said conducting member to said second position in response to a predetermined fault condition in said electrical circuit.

(Emphasis added.)

**Preamble of '398 Claim 1**

Hubbell first argues that Magistrate Judge Peebles incorrectly restricts the device recited in '398 Claim 1 to a GFCI (ground fault circuit interrupter).  Although P&S proposed this

-4-

construction in its Claim Construction Opening Brief, Hubbell challenges the construction for the first time in its objection to the Report and Recommendation.  The Court perceives no reason to excuse Hubbell's failure to raise the issue before Magistrate Judge Peebles; in any event, the Court agrees with Magistrate Judge Peebles' reasoning and recommendation in this regard.

**'398 Claim 1(c): "unitary, electrically conducting member carrying a pair of spaced electrical contacts"**

The Court next considers Hubbell's contention that the claimed "unitary, electrically conducting member carrying a pair of spaced electrical contacts" in Claim 1(c) of the '398 patent was erroneously broadened beyond a "single rigid structure."  Magistrate Judge Peebles recommends construing the word "unitary" as "comprising a unit."  He also recommends rejection of Hubbell's attempt to restrict '398 Claim 1(c) to a "rigid" structure.

The ALJ read Claim 1(c) as meaning "a member that provides an electrical current carrying path between two or more spaced contacts."  In issuing the Final Determination, the ITC modified the ALJ's reading to add the limitation "single," thus construing the member as "a single member carrying two or more spaced contacts that provides an electrical current-carrying path between two or more spaced contacts."  The Federal Circuit's construction of "unitary" as meaning "a single structural unit," *P&S v. ITC*, 617 F.3d at 1324, is essentially the same as Magistrate Judge Peebles' recommended construction, "comprising a unit."  The Court adopts the Federal Circuit's construction of the word "unitary."

The Court rejects Hubbell's argument that the member disclosed in '398 Claim 1(c) is limited to a rigid structure.  The Court adopts Magistrate Judge Peebles' discussion and recommendation on this issue.  As Magistrate Judge Peebles observes: "While the concept of rigidity is prevalent throughout the specification of the '398 patent, it is conspicuously absent from ... [Claim 1]."  Although the Federal Circuit did not explicitly address whether '398 Claim 1(c) is limited to a rigid structure, it did reject the argument that the structure in issue should be

limited to a "buss bar, or a member cast from a single die or molded from a single piece of metal."[1]  *P&S v. ITC*, 617 F.3d at 1324.  The Federal Circuit's sole mention of the word "rigid" was in the context of its discussion of the unitary nature of the structure.[2]  *See id.*  The Court does not read the decision in *P & S v. ITC* as requiring that the structure in '398 Claim 1(c) be rigid.

Accordingly, the Court holds that '398 Claim 1(c) means "a member comprising a single structural unit, carrying two spaced contacts and providing an electrical current-carrying path between the two spaced contacts."

**'398 Claim 1(d): "mounting means for said conducting member to permit movement thereof between a first position, wherein said pair of contacts are in respective, circuit-making engagement with said pair of terminals, and a second position, wherein both of said pair of contacts are in spaced, circuit-breaking relation to said pair of terminals"**

Claim 1(d) of the '398 patent is a "means-plus-function" limitation.  *See* 35 U.S.C. § 112. Construction of a means-plus-function limitation involves two steps: first, determination of the claimed function; and second, identification of the corresponding structure in the written description that performs that function.  *See JVW Enters. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1330 (Fed.Cir. 2005).

There is no objection to Magistrate Judge Peebles' concurrence with the ITC's definition of the function as "mounting the conducting member in such a way as to permit movement

---

[1]

The Federal Circuit stated:

> [T]his requirement of a unitary structure does not improperly confine the claim scope to a buss bar, or a member cast from a single die or molded from a single piece of metal. A unitary structure may contain layers or be formed by an additive process, so long as the resulting product has the physical character of a single unit.

*P&S v. ITC*, 617 F.3d at 1324.

[2]

The Federal Circuit stated:

> ...[T]he Summary of the Invention describes the member as being "rigid" and "in the nature of [a] buss bar."  Both descriptions refer to the member's physical characteristics; both imply a single structural unit. Additional description in the summary, which explains how the member moves and interacts with other parts of the device, also reveals that the inventor only contemplated a single structural unit.

*P&S v. ITC*, 617 F.3d at 1324 (citation to patent omitted).

between a first position, wherein said pair of contacts are in respective, circuit-making engagement with a pair of terminals, and a second position, wherein both of the pair of contacts are in spaced, circuit-breaking relation to the pair of terminals."  The Federal Circuit agreed with the ITC, adding that the definition requires that "each of the contacts moves from its first position into a spaced, circuit breaking relation with respect to each of its respective terminals."  *P&S v. ITC*, 617 F.3d at 1323-24.[3]  The Court thus holds that the function described in '398 Claim 1(d) is: "mounting the conducting member in such a way as to permit movement between a first position, wherein said pair of contacts are in respective, circuit-making engagement with a pair of terminals, and a second position, wherein both of the pair of contacts are in spaced, circuit-breaking relation to the pair of terminals, such that each of the contacts moves from its first position into a spaced, circuit breaking relation with respect to each of its respective terminals."

As for identifying the corresponding structure that performs the function, the record supports Magistrate Judge Peebles' recommended definition: "a mounting mechanism such as a block, including a central body and an arm for supporting the conducting member, and structural equivalents thereof."  In its objection to the Report and Recommendation, Hubbell argues that "mounting means" as defined by Magistrate Judge Peebles does not perform the function by itself and requires further structure, and that therefore it should be read to include posts, side tabs or legs such as those depicted in the preferred embodiment.  In the administrative proceeding, the ALJ rejected the same argument, relying in part on expert testimony that such posts and legs "do

---

[3]
The Federal Circuit stated:

> We agree with the Commission that the proper construction of the term "mounting means for said conducting member to permit movement thereof between a first position, wherein said pair of contacts are in respective, circuit making engagement with said pair of terminals, and a second position, wherein both of said pair of contacts are in spaced, circuit-breaking relation to said pair of terminals" requires that each of the contacts moves from its first position into a spaced, circuit breaking relation with respect to each of its respective terminals.

*P&S v. ITC*, 617 F.3d at 1323-24.

not perform any function during operation [of the GFCI] and were included in the preferred embodiment strictly for ease of manufacture and assembly." The ALJ's definition of the structure, "a block including a central body and an arm for supporting the conducting member, and structural equivalents thereof," is practically identical to the definition recommended by Magistrate Judge Peebles. The ITC implicitly approved the ALJ's definition, although it did not explicitly identify the structure.[4] On its appeal to the Federal Circuit in *General Protecht v. ITC*, Shanghai ELE Manufacturing Corporation, an alleged infringer, argued that the ITC erred in accepting the ALJ's definition of the structure of '398 Claim 1(d). The Federal Circuit did not address the argument, thus impliedly approving the ALJ's definition. The Court holds that the structure that performs the function described in '398 Claim 1(d) is "a block including a central body and an arm for supporting the conducting member, and structural equivalents thereof."

**'398 Claim 1(f): "latching means releasably retaining said conducting member in said first position"**

Claim 1(f) sets forth a "means-plus-function" limitation. *See* 35 U.S.C. § 112. There is no objection to Magistrate Judge Peebles' definition of the function as "releasably retaining the conducting member in the first position."

Magistrate Judge Peebles identifies the corresponding structure as "a latch member and a pin passing through a hole in a block having a shoulder that cooperates with a hole in the latch member, which latch member also includes a spring biasing the pin to retain the conducting member in the first position, and structural equivalents thereof." The ALJ identified the corresponding structure as "a pin passing through a hole in the block having a shoulder that cooperates with a hole in the latch member and a spring biasing the pin to retain the conducting

---

[4] The ITC modified the ALJ's construction of the function of '398 Claim 1(d), to add the function of "mounting." In so doing, the ITC implicitly adopted the ALJ's construction of the necessary structure when it stated: "Adding this function to the ALJ's identified function does not require any additional structure."

member in the first position, and equivalents thereof."  The ITC modified it to include a latch

member and spring, resulting in a definition that is virtually identical to that provided by

Magistrate Judge Peebles.

The Federal Circuit did not explicitly construe this term.  In *General Protecht v. ITC*,

however, the Federal Circuit held that a magnetic latch in an allegedly infringing device

performed the latching function in a "substantially different way than the structure disclosed in

the '398 patent."  619 F.3d at 1313.  In so ruling, the Federal Circuit stated: "the disclosed

structure in the '398 patent employs a mechanical solution requiring the interaction of a number

of separate parts, including a spring latching member, a pin with a shoulder extending through a

hole in the spring latching member, and a spring biasing the pin to pull against the force of the

spring latching member."  *Id*.  Thus, the Federal Circuit agreed with the ITC's definition of the

latching structure.

Hubbell argues that, in order to perform the latching function, the device must have

additional structure such as posts, side tabs, and legs.  There is no support in the '398 patent for

the interpretation proposed by Hubbell, nor does the Federal Circuit's discussion of the latching

function support this interpretation.

The Court adopts Magistrate Judge Peebles' discussion of '398 Claim 1(f) and his

recommended constructions.  Thus, the function of '398 Claim 1(f) is "releasably retaining the

conducting member in the first position."  The corresponding structure is "a latch member and a

pin passing through a hole in a block having a shoulder that cooperates with a hole in the latch

member, which latch member also includes a spring biasing the pin to retain the conducting

member in the first position, and structural equivalents thereof."

### The '340 Patent

As Magistrate Judge Peebles explains, U.S. Patent No. 7,283,340 ("'340 patent"), issued

October 16, 2007, titled "Electrical Wiring Device," teaches a means of deactivating a GFCI

device in the event of miswiring.  The Federal Circuit described the '340 patent as follows:

> The '340 patent is directed to a GFCI receptacle that "detects the wiring state of the device and inhibits operation if the device is miswired." When properly wired, the electrical source is connected to the GFCI's "line terminals," from which power flows into the rest of the device. However, there is a chance that an installer may accidentally miswire the electrical source to the device's "load terminals," which are normally intended for connection to downstream outlets that receive ground fault protection through the GFCI. If miswired, the devices do not protect against a ground fault. To effect the miswiring protection, the '340 patent has a "detection circuit" to detect whether the GFCI device is properly wired to an electrical circuit, and "four sets of interrupting contacts" configured to make or break an electrical circuit between the line terminals and the load terminals, depending on the signal from the detection circuit.

*General Protecht v. ITC*, 619 F.3d at 1307 (citation to patent omitted).

The disputed terms are found in '340 Claim 14, which states:

> 14. An electrical wire device comprising:
> line terminals and load terminals;
> at least one <u>detection</u> circuit including a circuit segment coupled between the line terminals and <u>configured to generate a predetermined signal in response to detecting a proper wiring condition, the predetermined signal not simulating a fault condition, a proper wiring condition being effected when the line terminals are connected to a source of AC power</u>; and
> an interrupting contact assembly coupled to the at least one detection circuit, the interrupting contact assembly including four sets of interrupting contacts that are configured to provide electrical continuity between the line terminals and the load terminals in a reset state and configured to interrupt the electrical continuity in tripped state, the interrupting contact assembly being substantially prevented from effecting the reset state absent the predetermined signal being generated by the at least one detection circuit.

(Emphasis added.)

## '340 Claim 14: "predetermined signal"

Magistrate Judge Peebles agrees with the ALJ, who construed "predetermined signal" in

'340 Claim 14 as meaning "a signal set in advance of device installation that does not simulate a

fault condition."  Hubbell argues that the proper construction is "a differential current on the hot

and neutral lines."  In rejecting Hubbell's proffered construction, Magistrate Judge Peebles states

that it "implies the existence of a simulated ground fault, [and thus] is directly at odds with the

requirement that the predetermined signal *not* be simulating a fault condition."  This Court agrees.

Although it did not expressly articulate a construction of "predetermined signal," the Federal

Circuit's use of the term in its discussion of "detection circuit" in '340 Claim 14 makes clear that

it approves the administrative construction.[5]  *See General Protecht v. ITC*, 619 F.3d at 1307-08.

Moreover, there is nothing in the Federal Circuit's discussion of the detection circuit that would

support Hubbell's argument.  The Court holds that "predetermined signal" in '340 Claim 14

means "a signal set in advance of device installation that does not simulate a fault condition."

**'340 Claim 14: "detect"**

Magistrate Judge Peebles writes that the word "detect" describes a concept that

is readily understood by persons of skill in the art.  He rejects Hubbell's proposed construction of

"detect" and its variants in '340 Claim 14 as meaning "discovering or determining the presence of

a fault condition."  As Magistrate Judge Peebles notes, Hubbell's proposed construction "does

nothing to provide the added clarity anticipated to result from the construction process."

The ALJ reached the same conclusion in construing "detection circuit" in '340 Claim 14.

In the administrative proceeding, respondent Wenzhou Trimone Company ("Trimone") argued

that "[t]he limitation 'at least one detection circuit' [in the '340 patent] means that the circuit

must 'discover or determine the existence, presence or fact' of proper wiring."  In rejecting this

construction, the ALJ wrote: "P&S's expert, Dr. Harman, pointed out on cross-examination that

the concept of 'detection' is well understood in the context of circuits.  In that regard, a circuit

---

[5]

In its brief on its appeal to the Federal Circuit in *General Protecht v. ITC*, respondent Shanghai ELE Manufacturing Corporation ("ELE") challenged the administrative definition of "predetermined signal."  The dissent in *General Protecht v. ITC* commented: "The majority apparently does not credit any of ELE's arguments regarding the 'predetermined' nature of the signal." 619 F.3d 1317, n.2.

reacts in a particular way to a particular stimulus." The ITC accepted this conclusion. Trimone did not argue this point in its brief before the Federal Circuit. The Federal Circuit's discussion of "detection circuit" in '340 Claim 14 provides no support for Hubbell's contention. *See General Protecht v. ITC*, 619 F.3d at 1307-08. The Court finds nothing in the patent or the record to support Hubbell's proposed construction, and adopts the Report and Recommendation in this respect.

### **"Detect" in the '386, '564, '793, '938, '158, and '005 Patents**

For the same reasons, the Court rejects Hubbell's recommended construction of the term "detect"and its variants in the following patents in addition to the '340 patent: the '386, '564, '793, '938, '158, and '005 patents. The Court adopts the Report and Recommendation in this respect.

### **The '386 Patent**

Magistrate Judge Peebles' summary of U.S. Patent No. 7,212,386 ("'386 patent"), issued May 1, 2007, entitled "GFCI With Miswire Lockout," includes the following:

> The '386 patent [is] an outgrowth of the '340 patent[.] ... [One] condition addressed in this patent is the situation presented when, through miswiring, AC power is connected to load terminals since load terminals are typically connected to the user load terminals, or receptacles on the device, such that when the device trips the conductive path between the line terminals and load terminals may be interrupted, but the load terminals and user load terminals are still connected, thereby failing to protect the ultimate user.

> These factors led the inventors to consider various modes of additional protection. ... The inventors concluded their description of the invention background by stating that "[w]hat is needed is a multi-shot method for testing miswiring. Further, a device is needed that eliminates any hazard at the receptacle outlets when the device is tripped."

(Citations to patent omitted.) Claim 1 – the only claim in issue – describes a device which provides a signal in response to detecting a proper wiring state.

Claim 1 of the '386 patent teaches as follows:

-12-

An electrical wiring protection device comprising:

a housing assembly including at least one line terminal and at least one load
    terminal partially disposed thereof;

a first conductive path electrically coupled to at least one load terminal;

a second conductive path electrically coupled to at least one load terminal, the
    second conductive path, being connected to the first conductive path
    in a reset state;

a fault detection circuit coupled to the first conductive path, the fault detection
    circuit being configured to generate a fault detection signal in
    response to detecting at least one fault condition;

<u>a wiring state detection circuit coupled to the first conductive path, the wiring
    state detection circuit selectively providing a wiring state detection
    signal when the at least one line terminal is coupled to a source of AC
    power</u>:

an actuator assembly configured to provide an actuator signal in response to
    the fault detection signal or the wiring state detection signal; and

a circuit interrupter coupled to the actuator assembly, the circuit interrupter
    being configured to disconnect the first conductive path from the
    second conductive path in response to the actuator signal in the reset
    state.

(Emphasis added.)

**'386 Claim 1: "a wiring state detection circuit coupled to the first conductive path, the
wiring state detection circuit selectively providing a wiring state detection signal when the at
least one line terminal is coupled to a source of AC power."**

In issue is the limitation: "a wiring state detection circuit coupled to the first conductive
path, the wiring state detection circuit selectively providing a wiring state detection signal when
the at least one line terminal is coupled to a source of AC power."  Magistrate Judge Peebles
recommends that it be interpreted to mean "a circuit, which is connected directly or indirectly to
the first conductive path, that specifically detects wiring of AC power to the line terminals and
selectively provides a signal specifically indicating proper wiring of the AC power to the line
terminals when this proper wiring state is present."

Hubbell's objection to Magistrate Judge Peebles' interpretation focuses on the phrase
"selectively providing a wiring state detection signal."  Hubbell argues that "selectively" refers to
"the action of a user providing a stimulus" such as "the reset button being depressed."  Hubbell
raised this argument before Magistrate Judge Peebles; in rejecting it, Magistrate Judge Peebles

states: "Because nothing in the patent claim or patent specification supports the additional requirement of user stimulus, I have not included it within my recommended construction." The Court agrees.

Magistrate Judge Peebles' construction is consistent with the holding in the administrative proceeding, in which the ALJ agreed with P&S's proposed definition of "wiring state detection circuit" as "a circuit that specifically detects wiring of AC power to the line terminals and selectively provides a signal when this proper wiring state is present." The ALJ further agreed with P&S's proposed definition of "wiring state detection signal" as "a signal from the wiring state detection circuit specifically indicating proper wiring of the AC power to the line terminals." The ALJ observed that the "signal" could be "generated either by automatic generation or by pressing the reset button." The ITC did not expressly construe the phrase "selectively providing a wiring state detection signal," although it addressed other aspects of Claim 1 of the '386 patent. The Federal Circuit addressed "circuit interrupter," the last term in Claim 1, but did not specifically address "selectively providing a wiring state detection signal." *P&S v. ITC*, 617 F.3d at 1325-26. No party to the administrative proceedings argued to the Federal Circuit that "selectively" refers to "the action of a user providing a stimulus." There is nothing in the administrative proceedings or the Federal Circuit decisions to support Hubbell's argument.

The Court adopts Magistrate Judge Peebles' analysis and his proposed construction. The limitation in issue is construed to mean: "a circuit, which is connected directly or indirectly to the first conductive path, that specifically detects wiring of AC power to the line terminals and selectively provides a signal specifically indicating proper wiring of the AC power to the line terminals when this proper wiring state is present."

## P&S'S OBJECTIONS TO THE REPORT AND RECOMMENDATION

### The '938 Patent

P&S challenges the recommended construction of one aspect of Claim 1 of U.S. Patent No. 7,375,938 ("'938 patent"), issued on May 20, 2008.  The '938 patent, titled "Miswire Protection Switch Compression Spring," addresses the need to disable the miswire protection circuit of a GFCI device during post-manufacture testing, and then, after testing is completed, to enable the miswire protection circuit without opening the housing.  It discloses a miswire protection circuit which includes a switch element that is open during testing, thus disabling the miswire protection circuit.  The switch element is then closed after testing, thus enabling the miswire protection circuit and making the device operational.  The dispute focuses on the feature that facilitates the closing of the switch element after testing.

Claim 1 of the '938 patent teaches as follows:

> 1. A ground fault circuit interrupt (GFCI) device, comprising:
> a GFCI device housing;
> a plurality of line terminals and a plurality of load terminals at least partially disposed in the GFCI device housing;
> a GFCI circuit enclosed within GFCI device housing and coupled to the plurality of line terminals and the plurality of load terminals, the GFCI circuit being configured to detect a predetermined condition, the predetermined condition including at least one ground fault condition and a simulated fault condition;
> a test circuit coupled between at least one of the plurality of line terminals and at least one of the plurality of load terminals, the test circuit including a test button configured to generate the simulated fault condition when the test button is depressed and the device is wired to a source of AC power;
> a second detection circuit coupled to the GFCI circuit and disposed within the GFCI device housing, the second detection circuit including a switch element configured to be in a first position during at least one post-manufacture test procedure to thereby disarm the second detection circuit during the at least one post-manufacture test procedure; and
> an accessible housing feature disposed on the GFCI device housing, an external stimulus being applied via the accessible housing feature to thereby throw the switch element into a second position to thereby enable the second detection circuit after the at least one post-manufacture test procedure is completed.

(Emphasis added.)

The '938 patent is a continuation of U.S. Patent No. 7,256,973 ("'973 patent") granted

August 14, 2007, also entitled "Miswire Protection Switch Compression Spring."  The Court

refers the reader to the discussion of the two patents in the Report and Recommendation.  The

abstract, drawings, and specifications of the two patents are virtually identical, although the

wording of the claims differs.  The limitation in the '973 patent that is comparable to the disputed

limitation in the '938 patent reads:

> a user-accessible housing feature disposed on the GFCI device housing, the
> user-accessible housing feature being in communication with the
> switch element, an externally generated stimulus being applied to the
> switch element to throw the switch element into a closed position by
> way of the user-accessible housing feature to thereby enable the
> second detection circuit after the at least one post-manufacture test
> procedure is completed.

(Emphasis added.)

Magistrate Judge Peebles recommends that the similar "housing feature" limitations in the

two patents be given the same construction: "a physical object, accessible to a user, located on but

physically distinct from the GFCI housing, wherein the physical object physically touches or is

otherwise in communication with the switch element."  P&S does not object to this reading of the

'973 patent.  P&S does, however, object to this reading of the '938 patent, on the ground that it

improperly restricts the "housing feature" to a physical object.  According to P&S, the '938

housing feature can be merely a hole in the housing through which the switch element may be

accessed.  P&S proposes that the "accessible housing feature disposed on the GFCI device

housing" be read to mean "a feature on the housing that is accessible to a user."

The Court adopts Magistrate Judge Peebles' proposed construction.  In the '938 patent,

Claim 1 itself does not disclose the nature of the housing feature or the manner of applying the

external stimulus to throw the switch element into a closed position.  Nor can the nature of the

housing feature or manner of applying the stimulus be determined by viewing '938 Claim 1 in the

context of the other '938 claims.[6]  Reading Claim 1 in the context of the entire '938 patent, *see Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed.Cir. 2005), the Court observes that the drawings and specifications disclose various embodiments of the '938 device, all of which include a physical object that is located on the housing and that communicates with the switch element.  For example, the second paragraph of the "Detailed Description" states: "[T]he present invention is directed to a ground fault circuit interrupt (GFCI) device" wherein "[a] protection switch is disposed on the exterior of the GFCI device housing and operatively coupled to the switch element."  The specification describing Figure 1 explains that, after manufacturing testing, the switch element "is actuated using [a] protection switch."  Figures 2 and 3, as described in the specifications, depict a "GFCI housing enclosure" that includes a "mis-wiring circuit protection switch ... disposed on the front of the enclosure."  Figures 4 and 5 depict a protection switch that includes a "bubble member"; the bubble member includes a domed wall member which couples an actuation button to the GFCI housing enclosure.  The actuation button is positioned such that, when it is depressed, it compresses a spring, causing the spring to throw the internal switch element into a closed position.  Figures 6 and 7 depict an "actuation plug" located on the housing and partially inserted therein.  The plug when pressed functions similarly to the actuation button in Figures 4 and 5.  Likewise, the "actuation button" depicted in Figures 8 and 9 is located on the housing and functions in the same way.  The bubble member, plug, and button are all physical objects, accessible to a user, located on but physically distinct from the GFCI housing.  Neither the claims nor the specifications of the '938 patent disclose a device which does not incorporate such a physical object.  Nor do they disclose any method of throwing the internal switch element

---

[6]

Application of the doctrine of claim differentiation to the '938 patent does not establish the nature of the housing feature or manner of application of stimulus in '938 Claim 1.  The Court refers the reader to Magistrate Judge Peebles' discussion of claim differentiation in connection with '973 Claim 13.  His reasoning applies equally to P&S's claim differentiation argument based on '938 Claim 7.  The Court finds that the limitation in '938 Claim 7 does not necessarily require that the housing feature in '938 Claim 1 must be a hole; rather, '938 Claim 7 merely specifies one potential configuration of the housing feature and manner of application of the stimulus.

into a closed position other than a spring (or elongated member as disclosed in '938 Claim 7) that is moved by the physical object.  The title of the '938 patent, "Miswire Protection Switch Compression Spring," highlights this aspect of the patented device, as does the abstract ("A protection switch is disposed on the exterior of the GFCI device housing and operatively coupled to the switch element.").  Thus, viewed in light of the other '938 claims and the '938 specifications and drawings, '938 Claim 1 teaches a housing feature that is a physical object located on but physically distinct from the housing.

This reading of '938 Claim 1 is reinforced when the '938 patent is viewed in tandem with its predecessor, the '973 patent.  As noted, the title, abstract, drawings, and specifications of the two patents are virtually identical, although the wording of the claims differs in some respects. P&S does not dispute that the housing feature in Claim 1 of the '973 patent is limited to "a physical object, accessible to a user, located on but physically distinct from the GFCI housing, wherein the physical object physically touches or is otherwise in communication with the switch element."  P&S, however, urges this Court to distinguish the '938 patent from the '973 patent on the ground that the disputed '938 limitation does not contain the phrase "in communication with" as does the analogous '973 limitation.  Reading the two limitations in context, the Court does not find this difference to be determinative.  Both limitations teach an exterior housing feature by way of which an external stimulus is applied to a switch element located inside the housing.  Claim 1 of the '938 patent does not disclose a different manner of application of external stimulus or a different type of housing feature than the '973 patent, nor does it otherwise support a substantial departure from the teaching of the '973 patent such as that proposed by P&S.  The Court finds nothing in the intrinsic evidence, including the prosecution histories of the two patents, to support such a departure.  Therefore, the Court finds that '938 Claim 1 teaches the same housing feature as that taught in '973 Claim 1.

-18-

Accordingly, the Court adopts Magistrate Judge Peebles' recommendation to construe "an accessible housing feature disposed on the GFCI device housing, an external stimulus being applied via the accessible housing feature to thereby throw the switch element into a second position to thereby enable the second detection circuit," taught in '938 Claim 1, to mean "a physical object, accessible to a user, located on but physically distinct from the GFCI housing, wherein the physical object physically touches or is otherwise in communication with the switch element."

### The '158 Patent

P&S objects to Magistrate Judge Peebles' proposed construction of the term "simulated ground fault" in independent Claim 1 and dependent claim 8 of U.S. Patent No. 6,873,158 ("'158 patent"), "Circuit Protection Device With Half Cycle Self Test," issued March 29, 2005.  The Report and Recommendation describes the '158 patent as follows:

> To address the reality that despite encouragement by manufacturers few users of GFCI devices actually test them on a regular basis, the '158 patent specifies circuitry for performing self-testing functions on the internal electrical components of the device during a period when the switching device cannot conduct current, and thus cannot trip the device. The self-testing is accomplished by introducing a current through the sensing transformer of the GFCI detector during a half-cycle of AC power when the switching device cannot conduct, providing a simulated ground fault and generating a response similar to that which would occur in the event of an actual ground fault.  If the GFCI device does not respond properly the device can trip to open the contacts, and interrupt current flow, or instead illuminate a lamp to visibly indicate the existence of a failure.

(Citations to patent omitted.)

The disputed terms are found in Claim 1 of the '158 patent, which reads:

> A self-testing protection device including a plurality of line terminals configured to be connected to an alternating current (AC) electrical distribution system, and a plurality of load terminals configured to be connected to at least one load, the device comprising:
> a ground fault simulation circuit for producing a simulated ground fault during a first predetermined half-cycle of AC power;
> a detector coupled to the ground fault simulation circuit, the detector

<u>configured to detect the simulated ground fault during the first
predetermined half-cycle of AC power, and transmit a detection signal
in response thereto</u>; and

an alarm circuit coupled to the detector, the alarm circuit being configured to
generate an alarm signal if the detection signal is not generated within
a predetermined period of time.

(Emphasis added.)  Magistrate Judge Peebles recommends that "ground fault simulation circuit"

be construed to mean "a circuit that provides an alternate current path from between the hot and

neutral line to create a simulated ground fault."  He further recommends that "simulated ground

fault" be construed to mean "an intentional creation of a difference in the magnitude of electrical

current flowing in the respective hot and neutral wires passing through the sense transformer of

the GFCI device."

P&S contends that Magistrate Judge Peebles improperly limits the simulated ground fault

to a differential current between the hot and neutral lines.  P&S asserts that it is undisputed that,

since before the time of the '158 invention, the term "simulated ground fault" was well known in

the field of ground fault circuit interrupters, and included the use of a third wire through the sense

transformers to simulate a fault.  Thus, according to P&S, "a ground fault simulation circuit for

producing a simulated ground fault" should be read more broadly to mean "a circuit that provides

a signal that is sent through the sense transformer to generate a response as if there were an actual

ground fault."

Based on a review of the claims in the '158 patent, the intrinsic record, the parties'

*Markman* submissions, and the parties' responses to the Report and Recommendation, the Court

adopts Magistrate Judge Peebles' discussion of this issue and his recommended construction.

Accordingly, "ground fault simulation circuit" is construed to mean "a circuit that provides an

alternate current path from between the hot and neutral line to create a simulated ground fault."

"Simulated ground fault" is construed to mean "an intentional creation of a difference in the

magnitude of electrical current flowing in the respective hot and neutral wires passing through the

sense transformer of the GFCI device."

**The '005 Patent**

U.S. Patent No. 6,980,005 ("'005 patent"), issued December 27, 2005, is a continuation of the '158 patent. It is entitled, "Circuit Protection Device with Timed Negative Half-Cycle Self Test." P&S points out that Magistrate Judge Peebles does not address the term "simulated fault signal" in the context of the '005 patent. To the extent that Magistrate Judge Peebles reads the term as having the same meaning as "simulated ground fault" in the '158 patent, P&S objects, and for the same reasons. The Court sees no basis in the patent or the record to assign a different meaning to "simulated fault signal" and related terms in the '005 patent than it assigns to similar terms in the '158 patent. Accordingly, the Court holds that "simulated fault signal" means "an intentional creation of a difference in the magnitude of electrical current flowing in the respective hot and neutral wires passing through the sense transformer of the GFCI device."

**CONCLUSION**

It is therefore

ORDERED that the letter motion (Dkt. No. 68) by defendant Hubbell, Inc. requesting the Court to consider the decisions of the Federal Circuit Court of Appeals in *Pass & Seymour, Inc. v. International Trade Comm'n*, 617 F.3d 1319 (Fed.Cir. 2010), and *General Protecht Group v. International Trade Comm'n*, 619 F.3d 1303 (Fed.Cir. 2010), is granted; and it is further

ORDERED that the Report and Recommendation of United States Magistrate Judge David E. Peebles (Dkt. No. 62) is accepted and adopted except to the extent necessary to conform to the decisions of the Federal Circuit Court of Appeals in *Pass & Seymour, Inc. v. International Trade Comm'n*, 617 F.3d 1319 (Fed.Cir. 2010), and *General Protecht Group v. International Trade Comm'n*, 619 F.3d 1303 (Fed.Cir. 2010); and it is further

ORDERED in U.S. Patent No. 5,594,398:

- that the device recited in Claim 1 is a GFCI ("Ground Fault Circuit Interrupter");

- that in Claim 1(c), "unitary, electrically conducting member carrying a pair of spaced electrical contacts" is construed to mean "a member comprising a single structural unit, carrying two spaced contacts and providing an electrical current-carrying path between the two spaced contacts";

- that in Claim 1(d), "mounting means for said conducting member to permit movement thereof between a first position, wherein said pair of contacts are in respective, circuit-making engagement with said pair of terminals, and a second position, wherein both of said pair of contacts are in spaced, circuit-breaking relation to said pair of terminals," the claimed function is: "mounting the conducting member in such a way as to permit movement between a first position, wherein said pair of contacts are in respective, circuit-making engagement with a pair of terminals, and a second position, wherein both of the pair of contacts are in spaced, circuit-breaking relation to the pair of terminals, such that each of the contacts moves from its first position into a spaced, circuit breaking relation with respect to each of its respective terminals"; and the corresponding structure is "a block including a central body and an arm for supporting the conducting member, and structural equivalents thereof"; and

- that in Claim 1(f), "latching means releasably retaining said conducting member in said first position," the claimed function is "releasably retaining the conducting member in the first position," and the corresponding structure is "a latch member and a pin passing through a hole in a block having a shoulder that cooperates with a hole in the latch member, which latch member also includes a spring biasing the pin to retain the conducting member in the first position, and structural equivalents thereof";

and it is further

ORDERED in U.S. Patent No. 7,283,340:

- that in Claim 14, "predetermined signal" is construed to mean "a signal set in advance of device installation that does not simulate a fault condition"; and

- that in Claim 14, Hubbell's proposed construction of "detect" is rejected;

and it is further

ORDERED in U.S. Patent No. 7,212,386; U.S. Patent No. 7,164,564 ; U.S. Patent No. 7,256,793; U.S. Patent No. 7,375,938; U.S. Patent No. 6,873,158; and U.S. Patent No. 6,980,005, as well as U.S. Patent No. 7,283,340, Hubbell's proposed construction of "detect" is rejected; and it is further

ORDERED in U.S. Patent No. 7,212,386 that "a wiring state detection circuit coupled to

the first conductive path, the wiring state detection circuit selectively providing a wiring state detection signal when the at least one line terminal is coupled to a source of AC power" is construed to mean "a circuit, which is connected directly or indirectly to the first conductive path, that specifically detects wiring of AC power to the line terminals and selectively provides a signal specifically indicating proper wiring of the AC power to the line terminals when this proper wiring state is present"; and it is further

ORDERED in U.S. Patent No. 7,375,938 that "an accessible housing feature disposed on the GFCI device housing, an external stimulus being applied via the accessible housing feature to thereby throw the switch element into a second position to thereby enable the second detection circuit" is construed to mean "a physical object, accessible to a user, located on but physically distinct from the GFCI housing, wherein the physical object physically touches or is otherwise in communication with the switch element"; and it is further

ORDERED in U.S. Patent No. 6,873,158:

•    that "ground fault simulation circuit" is construed to mean "a circuit that provides an alternate current path from between the hot and neutral line to create a simulated ground fault"; and

•    "simulated ground fault" is construed to mean "an intentional creation of a difference in the magnitude of electrical current flowing in the respective hot and neutral wires passing through the sense transformer of the GFCI device";

and it is further

ORDERED in U.S. Patent No. 6,980,005 that "simulated fault signal" is construed to mean "an intentional creation of a difference in the magnitude of electrical current flowing in the respective hot and neutral wires passing through the sense transformer of the GFCI device."

IT IS SO ORDERED.

January 5, 2011
Syracuse, New York

_____
Norman A. Mordue
Chief United States District Court Judge